IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 7, 2005

## FREDRICK SLEDGE v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-27638    Bernie Weinman, Judge**

---

**No. W2004-02357-CCA-R3-PC  - Filed October 12, 2005**

---

Petitioner, Fredrick Sledge, appeals the trial court's dismissal of his petition for post-conviction relief.  In this appeal, Petitioner argues that his counsel's representation at trial was deficient because he failed to file a motion to suppress Petitioner's statement to the police, and  he failed to investigate Petitioner's case or interview any witnesses.  After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and DAVID G. HAYES, JJ., joined.

Gerald Skahan, Memphis, Tennessee, for the appellant, Fredrick Sledge.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; and Alexia Fulgham, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## I.  Background

Petitioner was convicted of first degree felony murder and especially aggravated robbery. He was sentenced to death for the murder conviction and twenty years for the especially aggravated robbery conviction, and the trial court ordered the sentences to be served consecutively.  On appeal, this Court affirmed Petitioner's convictions and his sentence for his especially aggravated robbery conviction, but reversed his sentence for felony murder and remanded for a new sentencing hearing. *State v. Fredrick Sledge*, No. 02C01-9504-CR-00089, 1997 WL 730245 (Tenn. Crim. App., at Jackson, Nov. 25, 1997), *aff'd* 15 S.W.3d 93 (Tenn. 2000).  Following a second sentencing hearing, Petitioner was sentenced to life imprisonment for the murder conviction, and the life sentence was ordered to be served consecutively to the original twenty-year sentence for especially aggravated

robbery. This Court affirmed the sentence imposed by the trial court on remand. *State v. Fredrick Sledge*, No.W2001-02402-CCA-R3-CD, 2003 WL 57313 (Tenn. Crim. App., at Jackson, Jan. 6, 2003).

The facts surrounding Petitioner's convictions were summarized by this Court as follows:

The evidence presented at trial established that the victim, Johnny Harris, was killed in Memphis, Tennessee, on the evening of December 10, 1991. Dr. O'Brian C. Smith, Assistant Medical Examiner for Shelby County, performed the autopsy on the body the following morning. The autopsy revealed two gunshot wound tracks completely through the body. One bullet entered the left back, went through the heart, and came out of the chest. The other was in the back of the left knee, and it came out just below the kneecap.

Dr. Smith testified that the wounds were distant wounds, that is, the gun was shot from more than two feet away from the victim. Dr. Smith could not determine exactly how far away the victim was from the gun, but there was no powder residue on the victim's hands, which he said would tend to indicate the victim did not grab the gun when it was discharged.

The bullet that entered the back and went through the heart caused the death. Dr. Smith testified that the wound to the knee was consistent with a person whose leg was in a running motion when it was hit. He also testified that the bullet track in the back was consistent with a person bending forward, as in a running position. However, Dr. Smith acknowledged that the bullet tracks could also indicate that the shooter was positioned on a lower plane than the victim when the gun was fired.

Officer Sandra D. Palmer of the Memphis Police Department was the first officer at the scene, an apartment complex on 2240 Union Avenue. She received a dispatch and arrived at 10:57 p.m. Officer Palmer testified she saw a white male lying on his back, face up, pockets turned inside out, and bleeding from the chest area. The victim lived in apartment 19, but the body was lying in front of apartment 21. The victim's car was parked in front of apartment 19, and on the ground next to the car on the driver's side were some of the victim's personal belongings. There is an alley that runs parallel to the front of the apartment building, between the alley and the building are the parking spaces. Each apartment has two adjacent doors leading inside.

Officer Palmer saw no blood or shell casings in the area between the body and the items on the ground next to the car. The only blood she saw was on the ground next to the victim.

Officer Dana Stine of the Memphis Police Department was the patrolman responsible for the collection and preservation of the evidence at the scene. He took photos, dusted for prints, drew sketches, and collected and tagged the victim's personal belongings that were retrieved from the parking lot next to the driver's side of the victim's car and from the front seat of the car. Officer Stine recovered fingerprints from the victim's wallet and box cutter, but he was unable to get any prints from the victim's car. Officer Stine testified that because the victim's pants pockets were turned inside out, "it kind of appeared like he had to clean out his pockets or something like that." The victim did, however, have a gold necklace visibly hanging around his neck.

Officer Stine found four distinct bullet holes in the two doors leading into apartment 21, but he could only find three of the bullets. One spent bullet was still in one of the holes, while the two other bullets were inside the apartment, one in a mattress and one in a wall. He testified that both bullets found inside the apartment were traveling in an upward direction before they came to rest. He could not, however, determine the direction of travel of the bullet found in the outside door.

Officer Stine also took measurements of the scene. The victim's body was thirty-three feet away from the items found next to the car. There is a sixteen-inch rise from the ground level of the parking lot to the porch in front of apartment 21 where the body was lying. The alley is about thirty feet from the front of the building, and the alley has about a two-foot incline to the parking lot.

The State called three witnesses who were living in the apartment complex on the night of the murder. The first, James Falls, lived in apartment 21. Mr. Falls testified that he heard gunfire around 10:45 p.m. At first, he thought it was a car backfiring, but then he saw the bullets come through his apartment doors. Mr. Falls testified that he went to the floor and yelled to his wife to get onto the floor. He crawled to the kitchen and called 911. He testified that he did not look outside until the police arrived, but when he did look, he saw the victim lying on his front porch.

Clifford Anderson, another apartment resident, testified that he was on the Union Avenue side of the complex heading towards a convenience store at about 10:45 p.m. when he heard gunshots coming from the rear of the building. Mr. Anderson testified that he saw a man standing on a second floor balcony of the apartment building and thought that he might have been involved, but he did not see anything in his hands. Mr. Anderson then saw what appeared to be a male with a long black or brown trench coat and a short Afro or hat running in the alley behind the building towards Edgewood. He did not see the man carrying anything in his hands.

After he saw this man running, Mr. Anderson testified that he saw an early 1970's model blue Buick containing two or three people drive down Edgewood and make

a left heading east onto Union Avenue. He said that he saw the car moments after he saw the person running down the alley, and that the timing of the events led him to believe that the person he saw running had possibly gotten into the car. The car appeared to drive off at a normal rate of speed. After the car drove away, he called the police.

Darrell Hubbard lived on the second floor in apartment 44. He testified that on the night of the murder he heard five gunshots: first there was one, then a pause, then the other four were rapid. Mr. Hubbard looked out of his window and saw a person with white shoes, black pants, and a long black coat, with his hands in his pockets, running down the alley towards Edgewood. Mr. Hubbard testified he saw the person's face when the person appeared to be startled by something in the alley and turned around and looked back in Mr. Hubbard's general direction. Mr. Hubbard was about twenty to thirty feet away from the person. When he talked to the police that night, he told them that it appeared the person had a stocking on his head and that he would be able to identify the person if he were wearing the same clothes as he had on that night. At the trial, however, he testified that it appeared that night like the person had on a stocking because he was looking at the person through the screen in his window. While on the witness stand, Mr. Hubbard identified the defendant as the person in the alley.

On December 18, 1991, the defendant gave a statement to the police concerning the murder of Mr. Harris. Sergeant Richard David Roleson and Sergeant Ronald F. Wilkinson both advised the defendant of his rights before conducting the interview. Sergeant Wilkinson said that the defendant understood his rights, signed a waiver form, and agreed to answer questions from the officers. He also testified that at the time of the interview, the defendant seemed alert and did not appear to be under the influence of any narcotics or alcohol.

The following is a summation of the statement the defendant gave to Sergeants Wilkinson and Free of the Memphis Police Department:

> The defendant admitted to shooting someone with a revolver in some apartment complex on December 10, 1991. When asked why he shot the person, the defendant stated that the man grabbed his gun and he was scared. He admitted he was in the process of robbing the victim when he shot him.
>
> The defendant was at a friend's apartment with two other individuals, Antonio Crawford and Alex Bumpus, when the three of them decided to borrow a friend's Buick and go out and rob somebody in the mid-town area. They spotted an old man, about 5'6" tall, coming out of the Mega Market and trailed him to his apartment.

-4-

When they arrived at the man's apartment building, the defendant got the gun from Crawford in the front seat, got out of the car, and followed the man into an alley. The defendant was wearing Crawford's long black coat. He was holding the gun down to his side and approached the man and told the man to give him all his money. The man gave the defendant his billfold. The billfold contained only six or seven dollars and some sort of badge. The defendant asked the man if he was a cop or something, but the man just stood there without speaking. The defendant then went through the man's pockets, saying "this ain't all the money you got, I know it ain't."

While he was going through the pockets with his right hand, he held the gun in his left hand. The defendant kept asking the man if he had more money, but the man still did not say anything. After he searched the pockets, the defendant patted the man's clothing. The man then grabbed the gun and the gun went off. The defendant did not know if the man was hit.

The defendant walked away and saw that the man was following him, so the defendant shot away from him to scare him off. He thinks he fired the gun three or four times. The defendant then took off running. The defendant stated, "I thought I was shooting away from him, and I must have hit him, I didn't see nothing, to make sure he don't follow me." When he got back in the car, he gave the gun back to Crawford. The other two individuals asked whether he shot the guy. The defendant replied he did not know, but hoped he did not.

The defendant stated that he did not tell anyone else about the shooting, but stated that Crawford and Bumpus told their cousin Lisa they had robbed some old man, the defendant fired the gun, but they did not know whether the man was hit. The defendant also stated that he had robbed about four or five other people in Memphis. Finally, the defendant stated he was not trying to shoot the old man and he is sorry the man died.

The 1977 blue Buick the defendant and the other two were using on the night of the murder belonged to Davey Weeks. Kimberly Farmer borrowed the car from Mr. Weeks and then allowed Crawford, Bumpus, and the defendant to use it that evening. Ms. Farmer testified that the defendant was wearing black jeans and a long black coat, and that he had a gun in his coat pocket when they went out. She further testified that she saw the three men return no later than 11:00 p.m. that evening. When the three men returned, she overheard the defendant say, "he don't need his business discussed with no bitch and everybody needed to shut up before he killed

-5-

everybody that's conversating about him." Ms. Farmer also testified that the defendant said he would kill whoever snitched to the police about him. Ms. Farmer testified that when she talked to the defendant several days afterwards about the police looking for him, the defendant's reaction was normal; he did not care.

Nick A. Dodys, the victim's nephew, testified on behalf of the state. His testimony consisted only of personal information about the victim. The victim was 64 years old, about 5'6" tall, and in excellent health. He was retired from the restaurant business, and at the time of his death worked part-time as a butcher at a Mega Market. At one time he also worked in vehicle storage for the Memphis Police Department. The victim lived with and took care of his mother, and after her death he lived alone. Mr. Dodys testified that he and his mother, the victim's sister, would talk to the victim about twice a day, including the afternoon of the day of his death. Mr. Dodys testified that he attended his uncle's funeral.

*Sledge*, 1997 WL 730245, at \*1-4.

## II. Post-Conviction Hearing

Petitioner testified that he was eighteen-years-old at the time of his arrest. He said his family retained his trial counsel to represent him as soon as he was arrested. Petitioner said that when he first met with his counsel, he handed Petitioner a piece of paper to sign. Petitioner said that he thought the paper had to do with counsel's representation, but was actually a form waiving his right to a preliminary hearing. Petitioner said that he did not learn that the State was seeking the death penalty until about a year after his arrest.

Petitioner said that he did not meet with his counsel more than four times before trial, and each meeting was less than fifteen minutes long. Petitioner said that he did not have any indication in his files that counsel had interviewed any of the State's witnesses, and counsel did not interview any of his family members. Petitioner said that counsel did not discuss possible defenses and trial strategy during their meetings, but only urged Petitioner to accept the State's offer of a life sentence in exchange for a plea of guilty. Petitioner said that his counsel did not request the appointment of co-counsel to assist him. Petitioner asked counsel why there were two prosecutors and only "one of us," and counsel told Petitioner "he had it covered."

Petitioner said that he asked his counsel to file a motion to suppress his statement to the police. Petitioner said that he asked for an attorney during the interview, but his request was not granted. Instead, the police officers called his mother. Petitioner said that he was coerced into giving his statement. Petitioner conceded that his trial counsel filed a motion to suppress, but he said the trial court never conducted a suppression hearing. His trial counsel just told him, "It ain't going to happen."

On cross-examination, Petitioner said that he had heard that the police were looking for him after the offense. Officers arrived at his cousin's house and pointed their guns at Petitioner until he was handcuffed. Petitioner said that he was handcuffed during the interview. The police officers told him his "chances of going to the electric chair were increasing." Petitioner said that one officer hit him in the face with a telephone book. Petitioner said that he thought he would die if he did not confess.

Petitioner said that his counsel did not provide him with any copies of the State's discovery. Petitioner said that he only discussed whether or not he would testify on the morning of trial. Petitioner also said that counsel did not request a mental evaluation before trial, failed to discuss his co-defendants' testimony, failed to ask for an instruction on the lesser included offenses of felony murder, and failed to challenge the trial court's instruction to the jury on the definition of reasonable doubt.

Petitioner's trial counsel testified that he had been practicing law about thirty seven years, and had handled between fifteen and twenty murder cases. Counsel had represented Petitioner on an unrelated aggravated robbery charge prior to the murder charge. He said that counsel for Petitioner's co-defendants, as well as the State, shared discovery information and the witnesses' statements with him. Counsel visited the scene of the crime to check out the lighting in the alley since the offenses occurred at nighttime. Counsel was unaware of any potential defense witnesses. He said that he did not consider having a second attorney to assist him at trial, and did the necessary work himself even if one had been available. Counsel said it was his understanding that a second trial lawyer was not required at the time of Petitioner's trial.

Counsel said that he and Petitioner spoke several times before trial. Each meeting lasted between fifteen minutes and one hour. Counsel conceded that he probably had not spent a significant amount of time interviewing Petitioner's family members. Counsel believed it was in Petitioner's best interest to enter a plea of guilty based on the State's evidence, but said that it was Petitioner's decision as to whether or not to proceed to trial. A mental evaluation was conducted prior to trial, and Petitioner was found competent to stand trial.

Counsel said that he did file a "boilerplate" motion to suppress, but he did not pursue a suppression hearing because he actually wanted the statement read to the jury. Petitioner's defense rested on his claim that he shot the victim accidentally, and his statement was necessary to support that defense. Without the statement, counsel believed they would have no defense at all.

Counsel said that he did not challenge Mr. Hubbard's identification testimony in great detail during the trial, because he did not want to open the door to Mr. Hubbard's background. Mr. Hubbard was a former Viet Nam veteran who had been deployed in reconnaissance missions and thus trained in the area of the identification of suspects. He did, however, bring out during cross-examination the fact that Mr. Hubbard initially told the police he could only identify the victim's assailant if the assailant were wearing the same clothes.

On cross-examination, counsel conceded that the State did not disclose the name of one potential witness. It was his understanding, however, that this witness would testify that he saw Petitioner and his co-defendants following another man from an ATM to the man's apartment shortly before the offenses, and this testimony would not have helped Petitioner's case.

Counsel said that Petitioner had never told him that one of the officers struck him with a telephone book during his interview. Counsel said if he had any indication that physical force had been used during the interview that culminated in Petitioner's statement, he would have pursued a motion to suppress. Counsel denied that the State did not have a case without Petitioner's statement.

At the conclusion of the post-conviction hearing, the trial court found, "that the advice rendered and the services rendered by the defense counsel [were] within the range of competency demanded by an attorney in a criminal case," and that even if counsel had pursued a different strategy or conducted his investigation in a different manner, the outcome of Petitioner's trial would not have been affected based on the strength of the State's evidence. The trial court accordingly denied Petitioner's request for post-conviction relief.

## II. Standard of Review

In his appeal, Petitioner alleges that his trial counsel rendered ineffective assistance of counsel. A petitioner seeking post-conviction relief must establish his allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2003). However, the trial court's application of the law to the facts is reviewed *de novo*, without a presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). A claim that counsel rendered ineffective assistance is a mixed question of fact and law and therefore also subject to de novo review. *Id.*; *Burns*, 6 S.W.3d at 461.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must establish that counsel's performance fell below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In addition, he must show that counsel's ineffective performance actually adversely impacted his defense. *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 2067, 80 L. Ed. 2d 674 (1984). In reviewing counsel's performance, the distortions of hindsight must be avoided, and this Court will not second-guess counsel's decisions regarding trial strategies and tactics. *Hellard v. State,* 629 S.W.2d 4, 9 (Tenn. 1982). The reviewing court, therefore, should not conclude that a particular act or omission by counsel is unreasonable merely because the strategy was unsuccessful. *Strickland,* 466 U.S. at 689, 104 S. Ct. at 2065. Rather, counsel's alleged errors should be judged from counsel's perspective at the point of time they were made in light of all the facts and circumstances at that time. *Id.* at 690, 104 S. Ct. at 2066.

A petitioner must satisfy both prongs of the *Strickland* test before he or she may prevail on a claim of ineffective assistance of counsel. *See Henley v. State,* 960 S.W.2d 572, 580 (Tenn. 1997). That is, a petitioner must not only show that his counsel's performance fell below acceptable

standards, but that such performance was prejudicial to the petitioner. *Id.* Failure to satisfy either prong will result in the denial of relief. *Id.* Accordingly, this Court need not address one of the components if the petitioner fails to establish the other. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.

### III. Failure to Suppress Petitioner's Statement

Petitioner argues that his statement was unknowingly and involuntarily made because he unequivocally requested an attorney during the interview, and he was coerced into giving his statement. Petitioner contends that it is not clear from the record that he was read his *Miranda* rights or that he waived those rights. Accordingly, Petitioner argues that his trial counsel's failure to pursue the suppression of his statement was deficient conduct. Moreover, Petitioner contends that he was prejudiced by counsel's omission to actively pursue suppression of his statement because he would not have been convicted of felony murder if his statement had been suppressed.

The trial court found that counsel's decision not to pursue suppression of Petitioner's statement was a trial strategy based on the State's evidence. The trial court specifically found "that [Petitioner] was well aware of his right to testify and determine[d] he did not want to take the stand in the guilt stage of the trial." The trial court said, "[s]ince [Petitioner] had chose[n] not to testify, the strategy was not to object to the confession being admitted into evidence in order for the jury to hear [Petitioner's] contention that the actual shooting was an accident." The trial court observed that, in hindsight, the decision might "not have been the best course to take, but it would appear that [Petitioner] had nothing else to present to the jury." By its finding, the trial court implicitly concluded that Petitioner's post-conviction testimony was not credible regarding the use of physical force during the interrogation.

Officer Ronald Wilkerson with the Memphis Police Department testified at trial that Petitioner' interview began at 1:40 p.m. and concluded at 6:29 p.m. Officer Wilkerson testified that Petitioner was read his Miranda rights before the interview commenced, and Petitioner said that he understood his rights. Petitioner said that he wanted to make a statement, and he signed a waiver of his rights. Officer Wilkerson said that if Petitioner had given any indication that he did not want to talk the interview would have ceased. Other than Petitioner's allegations at the post-conviction hearing, there is no evidence to support a finding that Petitioner's statement was involuntarily entered into.

Trial counsel testified that, as part of the defense's trial strategy, he decided not to object to the introduction of Petitioner's statement because it was the only way to place before the jury Petitioner's contention that the shooting was accidental. At trial, Mr. Anderson testified that he heard gunshots around 10:45 p.m. on the night of the offenses, and then saw a male with a short Afro or hat and wearing a long, dark trench coat running down the alley toward Edgewood. He then saw a 1970's model, blue Buick drive down Edgewood and turn left on Union Avenue. Mr. Hubbard heard gunshots and saw a person wearing a long, black coat run down the alley toward Edgewood. Mr. Hubbard saw the runner's face when he looked back in Mr. Hubbard's direction, and identified

Petitioner as the man running down the alley. Ms. Farmer said that she loaned Mr. Weeks' 1977 blue Buick to Petitioner and his co-defendants on the night of the offenses. She said that Petitioner was wearing a long, black coat and was carrying a gun. Petitioner and the co-defendants returned to Ms. Farmer's apartment around 11:00 p.m. that evening. Petitioner said he would kill whoever "snitched" to the police about him.

Petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994) (citing *State v. Martin*, 627 S.W.2d 139, 142 (Tenn. Crim. App. 1981)). Based on the evidence presented at trial, we conclude that the evidence does not preponderate against the trial court's finding that counsel's decision to not press the suppression of Petitioner's statement was a tactical decision based on adequate information and preparation. Moreover, even if Petitioner's statement had been suppressed, the State's case-in-chief would still include the testimony of the various State witnesses at trial placing Petitioner alone in the alley after the sounds of gunfire were heard, wearing a long trench coat, armed with a gun, and running toward a blue Buick driven by the co-defendants. Accordingly, we conclude that even if counsel's choice of trial strategies was not the best course to take, Petitioner has failed to show that a different trial strategy would have affected the outcome of the trial. Petitioner is not entitled to relief on this issue.

Petitioner contends that counsel did not investigate his case, interview any of the State's witnesses, or identify potential defense witnesses. Petitioner argues that counsel was ineffective in his representation for failing to request the appointment of second counsel to assist him in the capital case.

Petitioner does not identify the defense witnesses he contends should have been called, nor does he suggest the scope of these witnesses' testimony. When a petitioner contends that his trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). This is generally the only way to show that the failure to identify or interview witnesses resulted in the denial of evidence which prejudiced the petitioner. *See id.* We conclude that Petitioner has failed to demonstrate deficient performance by his attorney or that any deficiency prejudiced his case.

Counsel testified that he investigated the crime scene to determine the amount of illumination in the alley where the offenses occurred. He obtained and reviewed all of the witnesses' statements from either the co-defendants' counsel or the prosecutor. He cross-examined Mr. Hubbard at trial concerning the inconsistencies in his first statement and his testimony at trial. The evidence does not preponderate against the trial court's finding that counsel met with Petitioner a sufficient amount of time to understand Petitioner's contentions as to what occurred at the scene of the crime and had adequately prepared for Petitioner's case.

Petitioner argues that counsel's decision to represent Petitioner in a death penalty case by himself was deficient and that Petitioner had the right to be represented by two attorneys. Petitioner's contention is based on Rule 13(b) of the Tennessee Rules of the Supreme Court which, at the time of Petitioner's trial, extended to the trial court the discretion to appoint two attorneys to represent an indigent defendant when the State sought the death penalty. *See Brimmer v. State*, 29 S.W.3d 497, 502 n.1 (Tenn. Crim. App. 1998).

Rule 13 sets forth the "qualifications and procedures for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel for indigent defendants in capital and non-capital . . . proceeding[s] in which a defendant has a statutory or constitutional right to appointed counsel." Tenn. R. Sup. Ct. 13(a). The record does not contain any indication that Petitioner informed the trial court that he was financially unable to hire counsel, and the record does not contain an order declaring Petitioner indigent at the time of trial. *See* Tenn. Code Ann. § 40-14-202(b). On the contrary, both Petitioner and his counsel testified that Petitioner's family retained his trial counsel to represent him soon after his arrest. Petitioner has thus not shown that he was eligible for the appointment of a second attorney by the trial court to assist him at trial. Even if Petitioner was eligible for appointed counsel, *see State v. Stephen John Abbott*, No. 01C01-9607-CC-00293, 1996 WL 411645 (Tenn. Crim. App., at Nashville, July 24, 1996), *no perm. to appeal filed*, the appointment of second counsel was discretionary with the trial court. Petitioner failed to show either that counsel's conduct was deficient by not requesting the appointment of additional counsel or that he suffered prejudice thereby.

## CONCLUSION

Based on the foregoing, we conclude that the evidence does not preponderate against the trial court's finding that counsel's performance fell within the range of competence demanded of attorneys in criminal cases. Furthermore, the evidence does not preponderate against the trial court's finding that Petitioner suffered no prejudice. Accordingly, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE